UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID B. ELLISTON, | : | CIVIL NO. 3:21-cv-1272 (JAM) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| ZELYNETTE CARON, *et al.* | : | MARCH 2, 2023 |
| *Defendants.* | : | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Warden Caron, DW McClendon, Corrections Officer Rios, and Corrections Officer McCalla ("defendants"), hereby move for summary judgment on all David Elliston's ("plaintiff") claims in this case as the undisputed material facts demonstrate that each defendant is entitled to judgment as a matter of law. Specifically, judgment must enter in favor of the defendants on all claims because plaintiff failed to exhaust his remedies regarding the claims he now asserts in this action as required by the Prison Litigation Reform Act ("PLRA"). Judgment must further enter in favor of defendants on the plaintiff's Eighth Amendment claims, as the plaintiff cannot establish the requisite elements of these claims. Nor, can the plaintiff establish the required elements of his Intentional Infliction of Emotional distress claims under Connecticut law.  Finally, judgment must enter in favor of the defendants as they are each entitled to qualified immunity.

Accordingly, as set forth more fully below, this Court should grant the defendant's motion for summary judgment.

## II.   **PROCEDURAL BACKGROUND**

The plaintiff initiated the instant action on September 23, 2021, claiming, *inter alia*, that in January, February, and March of 2020 the defendants were aware of the Coronavirus and how significant it was.   ECF #1, PL. Comp. ¶9.   More specifically, the plaintiff alleges that although the defendants were aware of the dangers of the pandemic, that in January 2020 they failed to protect or mitigate the spread of COVID-19 through the facility.   *Id.*, ¶10.   Further, plaintiff alleges the defendants failed to provide cleaning supplies (¶12), and failed to test for the virus, quarantine infected inmates, or provide masks (¶13).

This Court (*Meyer, J.*) filed its Initial Review Order ("IRO") dismissing any claim regarding time spent at the Northern Correctional Institution as well as any claim against the defendants in their official capacity.   IRO dated 5/10/22 pg. 5; ECF #9.   Counsel for the defendants appeared and filed an Answer with Affirmative Defenses.   Answer; ECF #16.   The defenses of failure to state a claim upon which relief may be granted, qualified immunity, and failure to exhaust were included in the Answer.   *Id.*, pg. 6.

## III.   **THE DEFENDANTS' UNDISPUTED FACTS**

The defendant respectfully refers this Court and the plaintiff to the Local Rule 56(a)(1) Statement of Material Facts Not in Dispute (hereinafter referred to as "Rule 56") attached to this Memorandum of Law.

IV.   **ARGUMENT**

### A. Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any fact and that the party is entitled to judgment as a matter of law." A principal purpose of a summary judgment motion under Rule 56 is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The party seeking summary judgment always has the initial responsibility of informing the Court of the basis for its motion by identifying the portions of the pleadings, affidavits or other documentary evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Id*. at 323-24. The moving party may satisfy this burden by demonstrating the absence of evidence supporting the nonmoving party's case. *See Pepsi Co., Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). The court construes the facts in the light most favorable to the nonmoving party's case. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162, (2d Cir. 2006), *cert. denied*, 549 U.S. 953 (2006).

When the moving party meets its burden and demonstrates the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to affirmatively set forth facts showing that there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(a). To defeat a motion for summary judgment, the non-moving party may not merely rely upon unsupported allegations made in their complaint, nor

rely on "mere speculation or conjecture" to overcome a motion for summary judgment. *Knight v. Fire Insurance Company*, 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987). The evidence must be presented in a manner consistent with its admissibility at trial. *See First National Bank Co. of Clinton, Ill. v. Insurance Co. of North America*, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the court properly relied upon documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to the litigants from third persons, and hearsay which does not fall under one or more exceptions listed in rules 803-805 of the Federal Rules of Evidence, may not be properly considered. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970); *Beyene v. Coleman Security Service, Inc.,* 854 F.2d 1179 (9th Cir. 1988*); Edward B. Marks Music Corp. v. Stansy Music Corp.,* 1 F.R.D. 720 (S.D.N.Y. 1941). Rather, the nonmoving party must, by affidavit or otherwise, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the nonmoving party does not respond, the court may accept as true the moving party's factual statements. D. Conn. L. R. Civ. P. 56(a)(1).

"[T]he mere existence of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party". *Id.* A "material fact" is one whose resolution will affect the ultimate determination of the case. *Id.* A party opposing a motion for summary judgment must point to "specific facts showing

that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The party opposing summary judgment must also produce evidence to show the existence of every element essential to the case which it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). Likewise, mere conclusory allegations and denials in legal memoranda are not evidence and cannot, by themselves, create a genuine issue of material fact where none would otherwise exist. *Id.*

**B. Judgment Must Enter in Favor of the Defendants on All Claims as the Plaintiff has Failed to Exhaust his Administrative Remedies as Required by the PLRA**

The Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997e(a), requires inmates to exhaust administrative remedies before seeking relief in federal court. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The exhaustion provision of the PLRA provides, in relevant part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In enacting 1997e, Congress sought to afford prison officials time and opportunity to address complaints internally and reduce the quantity, and improve the quality, of prisoner suits. *Porter*, 534 U.S. at 524-25.

The Supreme Court has consistently found the language of the PLRA exhaustion provision to be mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see also Jones v. Bock*, 539 U.S. 199, 211 (2007) ("There is no question that exhaustion

is mandatory under the PLRA.").  The Supreme Court has held that inmates must exhaust administrative remedies before filing any type of action "about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532.  The PLRA exhaustion requirement applies regardless of whether the inmate may obtain the specific relief he desires through the administrative process.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).

An inmate who fails to file administrative grievances and exhaust his remedies may not bring the claim in federal court.  *Adekoya v. Federal Bureau of Prisons*, 375 Fed. App'x. 119, 121 (2d Cir. April 2010) (barring inmate federal lawsuit where inmate failed to exhaust administrative remedies).  Further, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules."  *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  "An 'untimely or otherwise procedurally defective administrative grievance'…does not constitute proper exhaustion."  *Snyder v. Whittier*, 428 Fed. App'x. 89, 91 (2d Cir. 2011) (quoting *Woodford,* 548 U.S. at 83-84).  To properly exhaust a claim, a prisoner must comply with the prison grievance procedures, including utilizing each step of the administrative appeal process.  *Snyder*, 428 Fed. App'x. at 91; *see also Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("PLRA requires 'proper exhaustion,' which 'means using all steps that the agency holds out and doing so properly.'") (quoting *Woodford*, 548 U.S. at 89).  Completion of the exhaustion process after a federal action has been filed does

not satisfy the exhaustion requirement.  *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001).

The PLRA defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). There is no dispute that at the time of the allegations in the instant suit, as well as at the time the plaintiff filed the instant suit, the plaintiff was a "prisoner" as defined in the PLRA as he was a sentenced inmate incarcerated within DOC facilities. Accordingly, the exhaustion requirement of the PLRA applies to the plaintiff's action. *See Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004) ("Because [the plaintiff] was a confined prisoner at the time he filed his lawsuits, section 1997e(a) is applicable.") (emphasis added) (citations omitted).  Furthermore, the plaintiff is required to exhaust his administrative remedies for each claim he has asserted in federal court. *Baldwin v. Arnone*, No. 3:12cv243 (JCH), 2013.

Courts require inmates to take advantage of each step of an administrative appeal procedure in order to exhaust their administrative remedies. *See, e.g., Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("[G]rievances must now be fully pursued prior to filing a complaint in federal court"). An inmate's failure to exhaust administrative remedies before commencing suit is normally a question to be raised by way of motion for summary judgment. See *McCoy v. Goord*, 255 F.Supp.2d 233, 251 (S.D.N.Y.2003); *Torrence v. Pesanti*, 239 F.Supp.2d 230, 232 (D.Conn.2003).

"Special circumstances will not relieve an inmate of his or her obligation to adhere to the exhaustion requirement. An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable." *McClendon v. Casey,* No. 3:21-cv-003 (KAD), 2021 U.S. Dist. LEXIS 6995, at *7-8 (D. Conn. Jan. 14, 2021) (citing *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016)).

Under the Supreme Court's decision in *Ross v. Blake*, the Court declared that the *only exception* to PLRA's exhaustion requirement is when administrative remedies are "unavailable." 578 U.S. 632, 642 (2016). There are three (3) scenarios where administrative remedies may be "unavailable:" (a) when despite what regulations or guidance materials may promise, it amounts to a "dead end;" (b) when the administrative scheme is so opaque that it becomes, practically speaking, incapable of use; and (c) when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. *Id.* at 643-44. Should a plaintiff desire to rely on one of these exceptional scenarios to defeat summary judgment, it becomes the plaintiff's burden to present sufficient evidence to establish a genuine dispute of fact regarding the availability of administrative remedies. *Engles v. Jones*, No. 6:13-CV-6461 EAW, 2018 U.S. Dist. LEXIS 217540, at *26-27 (W.D.N.Y. Dec. 28, 2018) ("once a defendant demonstrates that the plaintiff has not exhausted his administrative remedies, the burden of proof shifts to the plaintiff to show that his case falls under at least one of the exceptions to the exhaustion requirement"); *see also Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 U.S. Dist. LEXIS 122217, at *24-25 (S.D.N.Y. Sep. 8, 2016).

<u>The Plaintiff Failed to Exhaust his Administrative Remedies as to All of his</u>
<u>Eighth Amendment Claims</u>

The administrative remedy, or grievance, procedure established by DOC for all issues, other than complaints related to medical care, is set forth in Administrative Directive ("AD") 9.6, "Inmate Administrative Remedies." Rule 56, ¶49; *see also* Exhibit K: Declaration of ARC Acus, attached Exhibit A.  For Plaintiff to properly exhaust his remedies concerning all his claims he is required to file grievances and follow the procedure laid out in AD 9.6. S*ee Riles v. Buchanan*, 656 Fed. App'x. 577, 579 (2d Cir. 2016) (Summary Order) ("The Connecticut Department of Correction ('DOC') requires inmates to submit grievances in accordance with Administrative Directive 9.6 ('AD 9.6')"). AD 9.6 effective 8/15/13 was the operative Inmate Administrative Remedies procedure available to the Plaintiff during 2020.  Ex. K, ¶3. AD 9.6 requires an aggrieved inmate to first seek informal resolution of his issues, in writing, through the use of an Inmate Request Form, prior to filing a formal grievance. AD 9.6(A).  AD 9.6 requires that in the request, *inter alia*, the "inmate must clearly state the problem and the action requested to remedy the issue" and provides that the appropriate correctional official has fifteen business days to respond. *Id*.  If the inmate is not satisfied with the response he receives *or receives no response*, the inmate must file a Level-1 grievance by depositing it in the "Administrative Remedies" locked box and attach documentation showing his attempts to resolve the issue informally. *Id*. at §6(C) (emphasis added).

The Level-1 grievance must be submitted within thirty calendar days "of the occurrence or discovery of the cause of the grievance," and the appropriate

correctional official has thirty business days to respond.  AD 9.6 at §6(C). If the inmate is not satisfied with the response to his Level-1 grievance, *or no response is provided* within the thirty days, the inmate may submit a Level-2 appeal within five days after receipt of the response. AD 9.6 at §6(I-K) (emphasis added). The Level-2 appeal constitutes the final level of appeal for all inmate grievances except for those that (a) challenge department policy, (b) challenge the integrity of the grievance procedure, or (c) exceed the thirty-day limit for a Level-2 appeal response. *Id*. at §6(K-L).

A review of the grievance records reveals that the plaintiff has failed to file, let alone fully exhaust, his available administrative remedies.  ARC Acus reviewed the records from the Robinson facility from January 1, 2020, through December 30, 2020, and there were no grievances filed by the plaintiff.  Rule 56, ¶¶53-54.  The plaintiff makes bald, conclusory, and unsubstantiated allegations that his grievances and complaints were mishandled or otherwise lost or not responded to.  PL. Comp., ¶¶8, 14, 16.  However, there is no evidence to support he ever filed a grievance.  If the plaintiff did not receive a response to a grievance he did file, the directive clearly indicates he could have filed a Level-2 appeal.  Again, there is no record of any grievance let alone a Level-2 appeal for failure to respond to a grievance.  To the extent the plaintiff is alleging that his informal requests were not approved or even considered, he is then required to proceed to a Level-1 grievance.  But that did not happen either.

Despite plaintiff's bald assertions the evidence clearly shows that the administrative remedy process was open and available to all inmates during this time.  Rule 56, ¶¶55, 58, 61.  ARC Acus provided as Exhibit B attached to his declaration the grievance logs from the Robinson facility showing that the grievance process was utilized by inmates during the time period in question.  *See* Acus Declaration, Exhibit B.  As well, Warden Caron stated in a declaration drafted and signed at or around the time in question with regard to a class action lawsuit filed at the beginning of the COVID-19 pandemic[1], the grievance process was open and available to inmates.  Rule 56, ¶61: Caron Declaration ¶25.

While the clear evidence is that the administrative remedies process was open and available at the Robinson facility during the operative times in the Complaint, if there was an issue, the plaintiff could have also availed himself of the administrative remedies process while he was housed at the NCI COVID-19 unit.  Again, the plaintiff failed to start the administrative remedies process while at NCI.  Capt. Congelos works in the District 1 office and has access to all the grievance records from the NCI facility.  Rule 56 ¶57.  Capt. Congelos states that the administrative remedies process was open and available to inmates housed temporarily at NCI.  *Id.*, ¶58.  Capt. Congelos completed a review of the NCI records for the time the plaintiff was there which revealed that the plaintiff did not file any grievances while at NCI.  *Id.*, ¶60.

The evidence is clear that the plaintiff failed to not only fully exhaust his administrative remedies, but he didn't even start the process.  Warden Caron, Capt.

---

[1] *McPherson et al v. Lamont et al*, 3:20-cv-00534 (JBA).

Acus, and Capt. Congelos all state the process was open and available during the early stages of the COVID-19 pandemic.  Records show (grievance logs) that the process at Robinson was open and available to inmates during the operative times in the Complaint and it was utilized by many.  The process was also available to the plaintiff when he was temporarily housed at NCI.  Plaintiff only makes bald assertions that he was denied the process without any corroboration.

Accordingly, defendants are entitled to judgment in their favor on all claims because plaintiff has failed to exhaust his administrative remedies prior to bringing suit as required under the PLRA.

### C. The Plaintiff's Eighth Amendment Claims Fail as a Matter of Law

Notwithstanding that the undisputed evidence demonstrates that plaintiff failed to exhaust his administrative remedies as to the claims asserted in this action, judgment must further enter in favor of the defendants as the plaintiff cannot establish the requisite elements of his Eighth Amendment claims.

A prisoner who seeks to establish an Eighth Amendment violation based on conditions of confinement must demonstrate that the officials' conduct reflects "the deliberate infliction of punishment," and not just "an ordinary lack of due care for prisoner interests or safety." *See Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994).  Such a claim requires a plaintiff to satisfy both an objective and subjective component.  *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw that inference.'" *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (citation omitted). A defendant who "failed to alleviate a significant risk that he should have perceived, but did not," does not constitute deliberate indifference. *See Farmer*, 511 U.S. at 838.   Prison staff "must take reasonable measures to guarantee the safety of the inmates" in their charge. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

"To state a claim for deliberate indifference to safety or failure to protect him from harm, [an inmate] must show that the conditions of his confinement posed a substantial risk of serious harm and that the defendants were deliberately indifferent to his safety." *Llewellyn v. Aldi*, No. 3:19-CV-1030 (KAD), 2019 WL 4139484, at *7 (D. Conn. Aug. 30, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Deliberate indifference exists when the defendant knows of and disregards an excessive risk to an inmate's safety." *Id.*; *see also Bridgewater v. Taylor*, 698 F. Supp. 2d 351, 357 (S.D.N.Y. 2010) (explaining that defendants must be aware of facts supporting an inference that the harm would occur and must actually draw that inference).

### i. Deliberate Indifference as to COVID-19 Generally

Regarding COVID-19 and prisons, courts have recognized the unique and difficult challenges faced by prison officials in responding to an unprecedented global pandemic and attempting to prevent and mitigate COVID-19 outbreaks in prison facilities and have accordingly afforded deference to prison officials in their management of prisons in response to COVID-19, especially when prison officials take preventative mitigation efforts. *See Carolina v. Feder*, No. 3:20-CV-658 (SRU),

13

2021 U.S. Dist. LEXIS 14102, at *19-20 (D. Conn. Jan. 26, 2021) ("In normal times, courts must 'accord substantial deference to the professional judgment of prison' officials on matters of prison administration . . . [and] [i]n attempting to prevent and stem COVID-19 outbreaks, prison officials are plainly entitled to that substantial deference.") (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)); *Chunn*, 465 F. Supp.3d at 172 ("[A] facility's aggressive response to a public health emergency with no preexisting playbook belies the suggestion that these apparent deficiencies are the product of deliberate indifference on the part of prison officials.").  Indeed, courts have found that prison officials were not deliberately indifferent to the risks posed by COVID-19 when they responded reasonably to the risk by implementing protective measures and protocols.  *See e.g.*, *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (finding that "the BOP has responded reasonably to the risk" of COVID-19 by implementing detailed mitigation efforts, and "therefore has not been deliberately indifferent. . . ."); *Valentine v. Collier*, 956 F.3d 797, 802-03 (5th Cir. 2020) (finding no deliberate indifference where prison officials have "taken and continue to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus"); *Chunn*, 465 F. Supp.3d at 202-03 (finding that preventative measures implemented by prison officials in response to COVID-19 "belie any suggestion that prison officials 'have turned the kind of blind eye and deaf ear to a known problem that would indicate' deliberate indifference") (quoting *Money v. Pritzker*, 453 F. Supp.3d 1103, 1132 (N.D. Ill. 2020)).

Under the objective component of a deliberate indifference claim, a plaintiff must demonstrate that the conditions to which he was exposed, "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). A prisoner must be incarcerated under conditions that, objectively, pose "a substantial risk of serious harm." *Hayes v. N.Y.C. Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 834). There is no "bright line test" to determine whether a risk of serious harm is "substantial" for Eighth Amendment purposes. *Lewis v. Siwicki*, 944 F.3d 427, 432 (2d Cir. 2019). Rather, the Court is required to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," i.e., "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). The court makes that determination considering the steps the facility has already taken to mitigate the danger. *Id.*

Therefore, when assessing the objective prong of a claim asserting that an inmate has been exposed to a substantial risk of serious harm from contracting COVID-19, "the relevant inquiry is whether [plaintiff] has presented evidence showing conditions posing a substantial risk of serious harm *after considering* the procedures the defendants put in place..." *Gibson v. Rodriguez,* No. 3:20-cv-953 (KAD), 2021 U.S. Dist. LEXIS 193755, at *14 (D. Conn. Oct. 7, 2021) (emphasis added). "[T]he relevant inquiry is whether petitioners have shown a substantial risk

of serious harm from COVID-19 at the [prison] in light of the countermeasures that the facility has in place." *Chunn v. Edge,* 465 F. Supp. 3d 168, 201 (E.D.N.Y. 2020). "While inadequate measures to protect [inmates] against COVID-19 can give rise to a claim for deliberate indifference, that substantial risk of serious harm must be evaluated in light of the totality of the conditions and precautions taken at the prison." *Ransom v. Banks,* No. 1:20-cv-10232 (MKV), 2022 U.S. Dist. LEXIS 45005, at *18 (S.D.N.Y. Mar. 14, 2022).

Thus, where measures have been put in place to combat the spread of COVID-19, the risk of harm to the plaintiff inmate is reduced—and therefore does not satisfy the objective prong of a deliberate indifference claim. *See*, *e.g., Monroe v. Jouliana,* No. 20 CV 6807 (VB), 2021 U.S. Dist. LEXIS 242385, 2021 WL 6052162, at *9 (S.D.N.Y. Dec. 20, 2021) (finding serious harm from COVID-19 not plausibly alleged by prison officials failing to provide a detainee with a mask and there being "definitely a lack of social distancing," even with the inclusion of additional allegations of "definitely insufficient cleaning," "the possibility that [the facility] doesn't have [the] antiviral filters that are required," and a "risk of 'numerous' inmates exposed to COVID-19" because of many other precautions taken to reduce risk); *Ransom,* 2022 U.S. Dist. LEXIS 45005, at *18 (plaintiff did not demonstrate he was subject to substantial risk of serious harm of contracting COVID-19, because risk had been reduced by precautions and conditions taken to combat spread of virus at prison); *Chunn*, 465 F. Supp. 3d 168, 201 ("serious doubt" plaintiff could establish objective prong in light of policies and protocols including restricting movement, enhancing

sanitation, creating quarantine and isolation units); *Valentine v. Collier,* 956 F.3d 797, 801 (5th Cir. 2020) (risk of harm under objective prong must be determined "after accounting for the protective measures [the prison system] has taken.")

### ii. Deliberate Indifference specifically as to this case

This Court allowed three deliberate indifference claims to proceed past the IRO stage.  The plaintiff's Eighth Amendment claims include, deliberate indifference, conditions of confinement, and cruel and unusual punishment.  IRO (ECF #9) dated 5/10/22, pg. 2.  Further, the plaintiff alleges that the defendants affirmatively knew in late December 2019, and in January, February, and March of 2020, that the novel coronavirus COVID-19 was sufficiently serious and the danger it posed.  *See generally* PL. Comp.  As will be shown below, the evidence shows that the defendants were not deliberately indifferent to the plaintiff as to any of his claims.

Initially, many of the facts the plaintiff bases his allegations on are provably false.  First, as of December 2019 the world was still unaware of COVID-19.  The World Health Organization ("WHO") first announced that the outbreak in China was caused by COVID-19 on January 10, 2020[2].  The first report of a lab-confirmed case in the United States was on January 20, 2020.  *Id.* it is not until a month and a half later that the first case of COVID-19 in Connecticut is announced on March 8, 2020, by Governor Lamont.  Rule 56, ¶1.  Governor Lamont then declares a public health emergency on March 10, 2020.  *Id.*, ¶2.  The first DOC employee who is confirmed testing positive is on March 23, 2020.  Immediately, the DOC institutes a wellness

---

[2] https://www.cdc.gov/museum/timeline/covid19.html

screening that is required for all employees entering a facility to pass before entry. *Id.*, ¶¶3-4.  As well, on the same day the CDC releases guidance for correctional institutions for how to manage COVID-19.  *Id.*, ¶6.  The first inmate who tested positive COVID-19 is identified as being housed at Corrigan on March 30, 2020.  *Id.*, ¶5.  On April 3, 2020, the CDC announces mask wearing guidelines[3].  On April 20, 2020, the state of Connecticut is placed under a mask mandate which is quickly followed suit by the DOC's mask mandate on April 22, 2020.  *Id.*, ¶¶8-10.

As well, plaintiff's allegations as to his medical condition when he contracted COVID-19 are directly contradicted by the record evidence.  Plaintiff had tested positive on April 20, 2020.  Rule 56, ¶15.  Plaintiff was routinely and consistently assessed for COVID-19 symptomology both at Robinson and after being transferred to NCI.  *Id.*, ¶17.  The plaintiff was generally asymptomatic except for isolated complaints of joint pain, fatigue, and coughing.  *Id.*, ¶18.  There is no indication in the records that the plaintiff ever suffered: sever migraines, loss of taste, loss of smell, loss of hearing, severe coughing, or discoloration of the tips of his toes.  *Id.*, ¶¶21-22.

<u>Objective Prong of Deliberate Indifference</u>

Based on the above timeline it is clear that there was no known serious risk of harm from late December 2019 through January, February, and arguably the first half of March.  However, the evidence demonstrates that once there was sufficient knowledge of the serious nature of the pandemic, DOC officials established protocols, in accordance with CDC guidelines, to combat the spread of COVID-19.  Some of the

---

[3] https://www.cdc.gov/museum/timeline/covid19.html

measures implemented DOC wide in an effort to prevent or limit infiltration of the virus into a facility included, canceling social visits, limiting inmate transfers among facilities to those that are required medical/mental health treatment needs and transfers necessary for safety and security, quarantining all new admits from the general population for fourteen days, canceling volunteer and limiting contractor access to facilities to only those who are the most essential, and performing temperature checks on incoming staff members prior to allowing them entry.  Rule 56, ¶41.  Other measures to either prevent or further limit the spread of the virus once in a facility included; widely distributing soap and other cleaning supplies among the inmate population, thoroughly cleaning common areas and frequent touch points, instituting quarantines of units when an inmate displays any symptoms of COVID-19, having inmates eat their meals in their units or cells where feasible, and modifying recreation to include only outside recreation and enforcement of social distancing guidelines[4].  *Id*., ¶42.  Specifically at the Robinson facility masks were provided to staff and inmates and they were required to wear them.  *Id*. ¶¶30-31. DOC employees were also screened before entry into the facility, and if inmates displayed symptoms of COVID-19 they are placed in quarantine.  *Id*., ¶¶32-33, 43.

In *Gibson*, the Court found that DOC medical professionals who created these policies acted reasonably, and therefore no objective risk of harm existed. *Gibson v. Rodriguez,* No. 3:20-cv-953 (KAD), 2021 U.S. Dist. LEXIS 193755, at *14 (D. Conn. Oct. 7, 2021).  These principles should be applied to the instant case. The policies and

---

[4] See also measures implemented at Robinson specifically.  Rule 56, ¶¶23-29.

protocols implemented by the DOC, and at Robinson specifically, reduced the risk of harm to the plaintiff such that he cannot establish he faced an objectively serious risk of substantial harm.

In the absence of facts demonstrating there was inherent risk in the facility, despite the substantial policies and protocols in place to reduce the risk of catching COVID-19, plaintiff cannot establish the objective prong of his claims regarding exposure.

<u>Subjective Prong of Deliberate Indifference</u>

Even if the plaintiff could provide sufficient evidence to establish the objective prong, he still fails to demonstrate the defendants acted with the requisite state of mind to meet the subjective prong of his claims. The subjective prong requires the plaintiff to prove that the defendants subjectively acted, or failed to act, while actually aware of a substantial risk that serious harm will result. *Farmer*, 511 U.S. at 837. As noted in the previous section, the plaintiff's allegations regarding when the defendants allegedly had knowledge of the serious nature of the COVID-19 virus is belied by the facts.  There must be evidence that evinces a conscious disregard of a substantial risk of serious harm. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Hathaway*, 37 F.3d at 66 (citation omitted). A defendant who "failed to alleviate a significant risk that he should have perceived, but did not,"

does not constitute deliberate indifference. *See Farmer*, 511 U.S. at 838. It is impossible

In fact, in cases that involved risk of exposure to COVID-19, many courts have found that evidence of adoption of policies and protocols to reduce the risk of inmates catching COVID-19 contradicted claims that officials were intentionally ignoring the risk. *See, e.g. Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) ("Accepting, as the district court did, that the defendants adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures, the defendants' actions likely do not amount to deliberate indifference."); *Brown v. Wetzel,* 20-CV-0512, 2020 U.S. Dist. LEXIS 239405, 2020 WL 8413496, at *1 (W.D. Pa. Dec. 18, 2020) (denying the plaintiff's second motion for a preliminary injunction for substantially the same reasons as plaintiff's first motion for a preliminary injunction was denied, holding that "the record reflects that officials [at the prison] have implemented policies to mitigate the risk of exposure [to COVID-19]. Those policies, including requiring the use of masks, limiting inmates' movements to promote social distancing, screening incoming visitors and staff; quarantining inmates that test positive for COVID-19; and providing inmates with antibacterial soap, which they are encouraged to use, appear to be consistent with Centers for Disease Control and Prevention ("CDC") guidance for limiting the spread of the virus. Given these precautions, Plaintiff does not show that the specific relief he requests . . . [is] necessary to avoid irreparable harm."); *United States v. Credidio*, 19-CR-0111,

2020 U.S. Dist. LEXIS 58238, 2020 WL 1644010, at *2 (S.D.N.Y. Apr. 2, 2020) ("[T]he Court cannot find that the BOP has been deliberately indifferent to [the inmate's] needs, in light of the numerous and significant plans and protocols recently implemented by the BOP to protect prisoners.").[5]

It is well-established that non-medical, supervisory custody officials may reasonably rely upon medical staff advice, and such reliance does not give rise to deliberate indifference. The defendants "[a]s…prisoner administrator[s]… justifiably may defer to the medical expert regarding treatment of inmate/patients…" *Anderson v. Ford*, No. 3:06-CV-1968 (HBF), 2007 WL 3025292, at *7 (D. Conn. Oct. 16, 2007); *Valentine v. Collier*, 993 F.3d 270, 277 (5th Cir. 2021) (not unreasonable for officials to rely on healthcare experts to create a response policy to COVID-19). Thus, because the Defendants here relied upon medical advice in implementing COVID-19 protocols and relied upon those protocols to combat COVID-19, they cannot be said to have acted with deliberate indifference.  Further, there is no evidence that establishes defendants ignored guidelines and executive orders for prisons or failed to institute measures to mitigate the spread of the virus. In fact, defendant Caron personally observed the procedures and protocols implemented at Robinson.  Ex. F, ¶¶7, 8, 11, 12, 17, 19.

---

[5] See also, *Fernandez-Rodriguez v. Licon-Vitale,* 470 F. Supp. 3d 323, 352 (S.D.N.Y. 2020) (in denying motion for preliminary injunction, court concluded that prison officials knew of the risk COVID-19 posed in prisons but did not disregard those risks as they took reasonable measures to abate the risk to inmates); *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) ("the BOP has 'responded reasonably to the risk'" of COVID-19 by implementing detailed protective measures "and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights").

Absent evidence that the Defendants were actually aware of an enhanced risk to the Plaintiff that would be sufficient to overcome their reliance on policies created by their medical staff, plaintiff cannot establish the subjective prong of his claim. Even if the measures taken were not "good enough" or did not perfectly prevent inmates from catching COVID-19, this is not sufficient to establish a claim for deliberate indifference. *See Malcolm*, 2021 U.S. Dist. LEXIS 12593, 2021 WL 190870, at *9 ("Although Petitioners seem to be arguing that the Eighth Amendment requires Respondents to maintain perfect compliance with those policies, perfection is not constitutionally required.").

To the extent plaintiff claims that the defendants failed to properly enforce or ensure policies and protocols were being followed, his claims fail. *See, e.g., Swain*, 958 F.3d at 1089 ("[L]apses in enforcement" of social-distancing policies during COVID-19 "do little to establish that the defendants were deliberately indifferent," absent evidence that prison officials were "ignoring or approving the alleged lapses.") Such actions do not evince deliberate indifference to the risk of contracting COVID-19, but rather demonstrates the defendants were attempting to address any potential risk.

Given these actions, defendants cannot be said to have acted with deliberate indifference. Accordingly, defendants are entitled to judgment as a matter of law as to these claims.

### D. The defendants are further entitled to judgment in their favor as they are entitled to qualified immunity

While judgment must enter in favor of the defendants as the plaintiff failed to exhaust his administrative remedies and cannot establish the requisite elements of

his Eighth Amendment claims, judgment must further enter in the defendants' favor as they are entitled to qualified immunity.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome qualified immunity, a plaintiff must show that (1) the defendant violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (citations omitted). The Court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

In the qualified immunity context, a right is "clearly established" if, at the time of the challenged conduct, it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). "To be clearly established, a legal principle must have a sufficiently clear founding in then-existing precedent [and] [t]he rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018).

The Supreme Court has recently, and repeatedly, instructed lower courts "not to define clearly established law at a high level of generality." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)).   Rather, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  The qualified immunity analysis must be "particularized" in the sense that "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Doninger v. Neihoff*, 642 F.3d 334, 345-46 (2d Cir. 2011). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Id.* at 345.  "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308.

Under the second prong of the qualified immunity analysis, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella v. Town of Wolcott,* 599 F.3d 129, 134 (2d Cir. 2010).  That is because qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)).

"The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (citation omitted).   Moreover, qualified immunity applies regardless of whether an officials' error is "a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact."  *Doninger*, 642 F.3d at 353.

In this case, the defendants are entitled to qualified immunity as the plaintiff has not established a constitutional violation against them, as detailed above.  *See Taylor*, 575 U.S. at 825.   Initially it should be understood that the plaintiff's assertions regarding any "knowledge" that any of the defendants had regarding COVID-19 is contradicted by the undisputed evidence.  The first person in the state of Connecticut to be confirmed as having COVID-19 was on March 8, 2020. Rule 56, ¶1.  Two days later the Governor declared a public health emergency.  *Id.*, ¶2.  Two more weeks goes by before the first DOC employee was confirmed to have tested positive for COVID-19 on March 23, 2020, and then a week later-March 30, 2020-the first inmate was confirmed to have tested positive. *Id.*, ¶¶3-4.  The CDC didn't release COVID-19 guidelines for correctional facilities until March 23, 2020.  *Id.*, ¶6.  And the state mask mandate wasn't instituted until April 20, 2020.  *Id.* ¶7.  There is no clearly established law that states the DOC was supposed to implement public health emergency procedures and policies before they had full knowledge of the dangers of COVID-19.

Additionally, it is important to note, especially for qualified immunity purposes and viewing the actions of the defendants in the specific context of this case, the

26

unique and challenging situation the defendants faced in managing a correctional facility during an unprecedented global pandemic and the outbreak of a novel and highly contagious virus once it was known and declared.  Indeed, the defendants were tasked with responding to "a public health emergency with no preexisting playbook[,]" *Chunn*, 465 F. Supp.3d at 172, and responding to it in the unique setting of a correctional facility.  Despite these challenges, the evidence in this case reveals that DOC and the defendants, took extraordinary efforts in order to quickly, and to the best of their ability given the circumstances, respond to the global pandemic and the risks posed by COVID-19 at Robinson.

Additionally, it is not clearly established that a custody official may be held liable for deliberate indifference when housing an inmate in accordance with policies and protocols seeking to protect the inmate from contracting COVID-19—particularly where the risk of contracting COVID-19 is already reduced by additional department wide policies and protocols developed by medical staff in conjunction with the CDC guidelines and recommendations from state health department. As described above, most cases have found that deliberate indifference will not lie where the risk of contracting COVID-19 has been reduced by measures to combat the virus, and especially where custody officials reasonably rely upon medical officials to create such policies and protocols. At the very least, no case from the Supreme Court or the Second Circuit has held that a defendant in similar circumstances to the defendants here had violated a plaintiff's Eighth Amendment rights. The absence of such a case is dispositive and mandates the defendants are entitled to qualified immunity.

As the evidence demonstrates that, once the COVID-19 pandemic was declared a health emergency the DOC and the defendants, followed recommendations of public health professionals and the CDC for correctional facilities in implementing procedures and protocols to combat COVID-19.  Moreover, throughout the pandemic updates and adjustments to the measures and protocols were made based on new information, developments, and recommendations from the public health professionals and the CDC as to how to best manage COVID-19 in a correctional setting.  No reasonable correctional official in the defendants' position would believe that he or she was required to act prior to the declaration of a public health emergency thus violating the plaintiff's constitutional rights.  Further, no reasonable officer could believe they were violating any of the plaintiff's clearly established rights by quickly and aggressively responding to an unprecedented global pandemic by following the recommendations of public health officials and the CDC for managing a novel and contagious virus in a correctional setting and implementing preventative measures and protocols accordingly once the public health emergency was declared.

This is especially so given that the defendants updated and adjusted protocols and measures based on new information and recommendations from health officials and the CDC.  Given all of this, it was objectively reasonable for the defendants to believe that they were not violating any of the plaintiff's clearly established rights. As a result, the defendants are entitled to qualified immunity.

### E. Plaintiff's Claims of Intentional Infliction of Emotional Distress Fail as a Matter of Law

The law is well settled that in order to state a claim of intentional infliction of emotional distress, "[i]t must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis*, 200 Conn. 243, 253 (1986) (Internal quotation marks omitted).  Whether the conduct of the defendants and the plaintiff's resulting distress are sufficient to satisfy each of these elements is a question, in the first instance, for this Court. Only if reasonable minds could differ, does the question become an issue for the jury to decide.  *Id*. (quoting *Mellaly v. Eastman Kodak Company*, 42 Conn. Sup. 17, 18 (1991)).

Extreme and outrageous conduct is an essential element in the tort of intentional infliction of emotional distress.  Mere insults, indignities, or annoyances that are not extreme and outrageous will not suffice.  *Biro v. Hirsch, Docket No.* CV0314442S, 1998 WL 59499 (Conn. Super. 1998), slip op. at 6 (citations omitted). Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.  *DeLaurentis v. New Haven*, 220 Conn. 225, 267 (1991).  But a claim for emotional distress will fail, even if the plaintiff suffered harm, where the conduct of the defendant was lawful.  *Brown*

*v. Ellis*, 40 Conn. Sup. 165, 168 (1984), citing, Restatement (Second) of Torts § 46, comment g.

The defendants deny taking any action for the purpose of intentionally inflicting emotional distress upon the plaintiff.  As noted above there was no constitutional violation of the plaintiff's rights in that they instituted necessary and reasonable procedures and protocols in order to manage the COVID-19 pandemic.  In no way was the plaintiff intentionally subjected to a serious risk of harm due to the virus.  All of the actions taken by the defendants were legitimate efforts to manage the spread of the COVID-19 virus in the DOC facilities and under the instruction of the CDC, and state public health officials.  The overwhelming and undisputed evidence shows that the defendants acted in a reasonable and lawful manner. Additionally, nearly all of the plaintiff's allegations are directly contradicted by the document and testimonial evidence. No reasonable person would believe that the actions of the defendants were extreme or outrageous in any way.  Further, the plaintiff cannot show that he suffered extreme distress or that the defendants conduct was the direct cause of the plaintiff's distress.

As the undisputed evidence clearly shows that the plaintiff cannot establish the necessary elements of this claim, and the actions of all of the defendants were not extreme or outrageous, judgment should enter for all the defendants as to plaintiff's state claim of Intentional infliction of Emotional Distress.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the defendants, respectfully request that this motion

be granted, and judgment entered in their favor as a matter of law.

*Respectfully submitted*,

DEFENDANTS,
ZELYNETTE CARON, *et al*.

WILLIAM TONG
ATTORNEY GENERAL

BY:___/s/ *James W. Donohue*_____
James W. Donohue
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct28566
E-Mail:  james.donohue@ct.gov
Tel: (860) 808-5450
Fax: (860) 808-5591

## <u>CERTIFICATION</u>

I hereby certify that on March 2, 2023, a copy of the foregoing was mailed to the following:

David Elliston #298374
Brooklyn C.I.
59 Hartford Road
Brooklyn, CT  06234

<u>    /s/ *James W. Donohue*       </u>
James W. Donohue
Assistant Attorney General