UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x
DAVID ELLISTON,                                                    :
                                                                   :
        Plaintiff,        :
                                                                   : **MEMORANDUM &**
 -against-                                                   : **ORDER**
                                                                   :
ZELYNETTE CARON, *et al.*,                                         : 21-CV-1272 (VDO)
                                                                   :
        Defendants.      :
------------------------------------------------------------------ x

**VERNON D. OLIVER**, United States District Judge:

  The plaintiff, David Elliston ("Elliston"), formerly incarcerated, commenced this civil rights action while incarcerated asserting a claim of deliberate indifference to his health and safety. Defendants have filed a motion for summary judgment on three grounds, that Elliston failed to exhaust his administrative remedies before commencing this action, fails to state a cognizable deliberate indifference claim, and Defendants are protected by qualified immunity. For the following reasons, the motion for summary judgment is GRANTED.

**I.** **STANDARD OF REVIEW**

  A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard

applies whether summary judgment is granted on the merits or on an affirmative defense ….” *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks and citation omitted). To defeat a motion for summary judgment, the non-moving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

The court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012). However, although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

II.     **FACTS**[1]

    A.     **Background on COVID-19**

On March 8, 2020, Governor Lamont issued a press release stating that the first Connecticut resident had tested positive for COVID-19. Defs.' Local Rule 56(a)1 Statement, Doc. No. 29-2 ¶ 1. Two days later, Governor Lamont declared a public health emergency, due, in part, to the shortage of personal protective equipment. *Id.* ¶ 2.

On March 23, 2020, the first correctional employee, who worked at Garner Correctional Institution, tested positive for COVID-19. *Id.* ¶ 3. Effective that same day, the Department of Correction ("DOC") required that all correctional employees pass a wellness screening before entering any correctional facility. *Id.* ¶ 4.

---

[1] The facts are taken from the parties' Local Rule 56(a) Statements and supporting exhibits. Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)3.

Defendants informed Elliston of this requirement. *See* Notice to Self-Represented Litigant Concerning Motion for Summary Judgment as Required by Loc. R. of Civ. Pro. 56(b) , Doc. No. 29-3. Defendants also noted the absence of required citations in Elliston's Local Rule 56(a)2 Statement in their reply brief. *See* Doc. No. 37. Elliston, however, did not seek leave to file a sur-reply to correct his Local Rule 56(a)2 Statement.

The fact that Elliston is unrepresented does not excuse him from complying with the court's procedural and substantive rules. *See Evans v. Kirkpatrick*, No. 08-CV-6358T, 2013 WL 638735, at *1 (W.D.N.Y. Feb. 20, 2013) (citing *Treistman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006)); *see also Jackson v. Onodaga Cnty.*, 549 F. Supp. 2d 204, 214 (N.D.N.Y. 2008) ("when a plaintiff is proceeding *pro se*, 'all normal rules of pleading are not absolutely suspended" (citation omitted). Thus, Defendants' facts, where supported by evidence of record, are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions....").

On March 30, 2020, the first inmate, who was incarcerated at Corrigan-Radgowski Correctional Center, tested positive for COVID-19. *Id.* ¶ 5. On about March 23, 2020, the Centers for Disease Control ("CDC") issued guidance to correctional facilities on the management of COVID-19. *Id.* ¶ 7. In accordance with the CDC guidance, in an effort to control the spread of COVID-19, DOC designated Northern Correctional Institution ("Northern") as the medical facility to house all inmates who had contracted COVID-19. *Id.* ¶ 6.

On April 20, 2020, Connecticut instituted a mask mandate. *Id.* ¶ 8. On April 22, 2020, all inmates were required to wear masks whenever they exited their cells or cubicles or when they were in common areas. *Id.* ¶ 9. That same day, correctional staff was required to wear masks are all times while inside a correctional facility. *Id.* ¶ 10.

### B. Elliston's Records re COVID-19

From May 22, 2017 until April 23, 2020, Elliston was housed at Carl Robinson Correctional Institution ("Robinson"). *Id.* ¶ 11. On April 20, 2020, Elliston tested positive for COVID-19. *Id.* ¶ 15. This was the only time he tested positive. *Id.* ¶ 16. Between April 20, 2020 and April 23, 2020, medical staff at Robinson routinely assessed Elliston's COVID-19 symptomology. *Id.* ¶ 17.

On April 23, 2020, he was transferred to the Northern COVID-19 unit. *Id.* ¶ 12. On May 4, 2020, Elliston returned to Robinson where he remained until April 13, 2021. *Id.* ¶¶ 13-14. At Northern, Elliston had isolated complaints of fatigue, coughing, and joint pain but was otherwise asymptomatic. *Id.* ¶ 18. Elliston's medical records show that his vital signs remained within normal limits and that he had no active respiratory issues, a fact confirmed by a negative

chest x-ray in August 2020. *Id*. ¶ 19. Medical records show no complaints of severe migraines, loss of taste, loss of smell, severe coughing, or loss of hearing in his right ear. *Id*. ¶¶ 21-22.

### C. COVID-19 Protective Measures at Robinson

The inmate population was reduced from 1,314 inmates on March 1, 2020, to 946 inmates on May 7. 2020. *Id*. ¶ 23. In addition, the facility attempted to increase social distancing by cancelling many congregate activities, such as congregate religious services, congregate school activities, and recreation. *Id*. ¶ 24. Inmates did not engage in activities with inmates in other housing units. *Id*. Commissary purchases and medication were delivered to the housing unit and meals were eaten there instead of in the dining hall. *Id*. All programming and orientation occurred in the housing unit. *Id*.

Inmates were provided guidance on ways to keep safe from COVID-19 which included social distancing whenever possible, frequent hand washing, and reporting symptoms. *Id*. ¶ 25. All areas of the prison were cleaned continuously with bleach and a cleaning agent. *Id*. ¶ 26. Communal showers were cleaned between two and three times per shift. *Id*. ¶ 27. However, because the showers at Robinson are located within the dorms and staff cannot restrict when inmates may shower, it was not possible to have the showers cleaned after each use. *Id*. Inmates were provided bleach, the cleaning agent, and paper towels to clean their bunk areas upon request. *Id*. ¶ 28. These items were stored in the officer's bubble. *Id*. To reduce the possibility of cross-contamination of dormitories, each side of the housing unit has been provided its own cleaning supplies. *Id*. ¶ 34. Correctional staff also does not move from one housing unit to another. *Id*.

Soap was available from the commissary and indigent inmates were provided free soap. *Id*. ¶ 29. All inmates were provided at least one cloth mask which could be exchanged for a

clean one each week. *Id*. ¶ 30. Inmates were required to wear a cloth mask whenever they left their cubicles or were in a common area. *Id*.

Staff were provided at least a cloth mask and one N-95 mask. *Id*. ¶ 31. As of April 22, 2022, staff were required to wear at least a cloth mask at all times whenever in the facility. *Id*. Before entering the facility, staff were screened for COVID-19 by a temperature check and questions regarding symptoms. *Id*. ¶ 32. Any staff member with a fever or exhibiting COVID-19 symptoms was denied entrance to the facility. *Id*.

If an inmate displayed COVID-19 symptoms, he would be sent to the medical unit, placed on quarantine status, tested for symptoms, and placed on medical observation status. *Id*. ¶ 33. The inmate's cell would be deeply cleaned. *Id*.

D.   **DOC-wide COVID-19 Protective Measures**

DOC has adjusted its procedures and protocols to conform to CDC guidelines. *Id*. ¶ 35. On April 7, 2020, Northern was declared the facility to primarily house COVID-19 positive inmates.[2] *Id*. ¶ 36. Northern was chosen because it had attributes most appropriate for containing the spread of COVID-19, such as space completely separate from non-COVID-19-positive inmates, solid walls and doors, and airflow into and out of the cell from outside and separate from other areas of the building to reduce the air-borne spread of COVID-19. *Id*. ¶ 37. In addition, Northern best met DOC needs for safety, security, and transportation logistics. *Id*.

---

[2] Facilities with specialized populations, such as York Correctional Institution (women), Manson Youth Institute, and Garner Correctional Institution (mental health), did not send COVID-19 positive inmates to Northern. *Id*. ¶ 36.

Northern had a dedicated medical staff including at least one doctor or APRN per day shift and twenty-four-hour nursing coverage, seven days a week. *Id.* ¶ 38. For inmates exhibiting symptoms, nurses conducted rounds every shift. *Id.* ¶ 39. At least once per day, they performed routine blood pressure, temperature, pulse, respiration, lung sound, pulse oximeter, and pain scale checks. *Id.* The nurses also monitored the inmates on each shift and performed re-evaluations and addressed other concerns as needed. *Id.* Inmates were not returned to their housing units until they were fever-free for at least seventy-two hours without fever-reducing medication, their symptoms had improved, and at least fourteen days had passed since the inception of symptoms, a time longer than the CDC recommendation. *Id.* ¶ 40.

In addition to checking all staff before allowing entrance, additional measures were adopted in accordance with CDC guidelines to reduce the chance of introducing COVID-19 into a facility: social visits were cancelled, transfer of inmates among facilities was restricted to transfers necessary for medical or security reasons, all new inmates were quarantined for fourteen days before being allowed in general population, volunteers were cancelled and contractors were restricted to only the most essential. *Id.* ¶ 41.

DOC widely distributed soap and cleaning supplies, thoroughly cleaned common areas and frequent touch points, and quarantined whole units when an inmate displayed COVID-19 symptoms. *Id.* ¶ 42. Inmates ate in their cells or the housing unit common area and recreation was restricted to outdoor recreation with social distancing guidelines enforced. *Id.* All inmates displaying COVID-19 symptoms were placed in medical isolation and all inmates who tested positive for or were exposed to COVID-19 were quarantined. *Id.* ¶ 43. Masks that complied with CDC recommendations were provided to staff and inmates and required to be worn. *Id.* ¶¶ 44-45.

E.     **Exhaustion of Administrative Remedies**

Inmates are encouraged to use the administrative remedy, or grievance, process for complaints about staff, other inmates, and safety concerns. *Id*. ¶¶ 47-48. The procedures to file an administrative remedy are contained in DOC Administrative Directive 9.6, section 6. *Id*. ¶ 49.

When a grievance is filed, a file is created, a receipt is issued, and the grievance is entered into the grievance log. *Id*. ¶¶ 50-51. The grievance, grievance file, grievance log, and any record of an inmate participating in the grievance process are confidential; the records are kept locked in a secure cabinet accessed only by the Administrative Remedies Coordinator. *Id*. ¶ 52.

Captain Acus, the Administrative Remedies Coordinator states inmates filed administrative remedies which were collected and processed during this period. *Id*. ¶ 55. DOC records show that Elliston did not file any administrative remedies at Robinson from January 1, 2020 through May 6, 2022. *Id*. ¶¶ 53-54.

Captain Congelos, formerly in charge of the COVID unit at Northern, stated that the grievance process was open and available to inmates housed temporarily at Northern. *Id*. ¶¶ 57-58. Captain Congelos searched the administrative remedy records at Northern and found that Elliston did not file any administrative remedies while he was confined in the COVID unit at Northern. *Id*. ¶¶ 59-60.

III.    **DISCUSSION**

The only remaining federal claim is that Defendants were deliberately indifferent to Elliston's health and safety by refusing his requests for a mask, cleaning supplies, and transfer to a safer unit. *See* Initial Review Order, Doc. No. 9 at 4, Meyer, U.S.D.J. As all defendants

8

are alleged to work at Robinson, the claim concerns only Elliston's confinement at Robinson, and not his brief confinement at Northern. *Id.* Defendants move for summary judgment on three grounds, Elliston failed to exhaust his administrative remedies, Elliston fails to state a cognizable claim, and Defendants are protected by qualified immunity.

### A.      Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies *before* a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion"; the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see*

9

*also Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"); *Timmons v. Schriro*, No. 14-CV-6606 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("The law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

The Supreme Court has held that the requirement for proper exhaustion is not met when a grievance is not filed in accordance with the deadlines established by the administrative remedy policy. *Jones*, 549 U.S. at 217-18 (citing *Woodford*, 548 U.S. at 93-95). In addition, exhaustion of administrative remedies must be completed before the inmate files suit. *Baez v. Kahanowicz*, 278 F. App'x 27, 29 (2d Cir. 2008). Completing the exhaustion process after the complaint is filed does not satisfy the exhaustion requirement. *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001).

Special circumstances will not relieve an inmate of his obligation to comply with the exhaustion requirement. An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 642. The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (quotation marks and internal citations omitted).

The *Ross* Court identifies three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently

10

unwilling to provide any relief to aggrieved inmates." *Id*. at 643. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643. The Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016). In considering the issue of availability, however, the court is guided by these illustrations. *See Mena v. City of New York*, No. 13-cv-2430(RJS). 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Exhaustion of administrative remedies is an affirmative defense. Thus, the defendant bears the burden of proof. *See Jones*, 549 U.S. at 216. Once the defendant establishes that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must establish that administrative remedy procedures were not available to him under *Ross*, or present evidence showing that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability").

The general inmate grievance procedure is set forth in Administrative Directive 9.6. *See* Defs.' Mem. Ex. A to Exhibit K, Acus Decl., Doc. No. 29-14 at 8-21. An inmate must first attempt to resolve the matter informally. He may attempt to verbally resolve the issue with an appropriate staff member or supervisor. Dir. 9.6(6)(A). If attempts to resolve the matter verbally are not effective, the inmate must make a written attempt using a specified form and

11

send the form to the appropriate staff member or supervisor. *Id.* If an inmate does not receive a response to the written request within fifteen business days, or the inmate is not satisfied with the response to his request, he may file a Level 1 grievance on form CN9602. Dir. 9.6(6)(C).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *Id.* The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. Dir. 9.6(6)(I). The Unit Administrator may extend the response time upon notice to the inmate on the prescribed form. Dir. 9.6(6)(J).

The inmate must appeal the disposition of the Level 1 grievance by the Unit Administrator, or the Unit Administrator's failure to dispose of the grievance in a timely manner, to Level 2. The Level 2 appeal of a disposition of a Level 1 grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. The Level 2 appeal of the Unit Administrator's failure to dispose of the Level 1 grievance in a timely manner must be filed within sixty-five days from the date the Level 1 grievance was filed by the inmate and is decided by the District Administrator. Dir. 9.6(6)(K) & (M).

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or Level 2 appeals to which there has been an untimely response by the District Administrator. Dir. 9.6(6)(L).

Elliston first asserted his claim against Defendants in his Complaint filed September 23, 2021. Thus, he must have properly completed the exhaustion process by that date. *See Baez*, 278 F. App'x at 29 (exhaustion must be completed before the inmate files suit).

Defendants have presented evidence that Elliston did not file a grievance on his issues. In his complaint, Elliston alleged only that he submitted requests and initial grievances which were ignored. Doc. No. 1 ¶ 14. In response to the motion for summary judgment, Elliston submits his declaration stating that, between January and March 2020, he filed grievances and grievance appeals but the defendants never answered them. Doc. No. 36-1 ¶ 23. He further states that he filed other grievances and appeals in April 2020 but the grievance coordinator at Robinson, in collusion with the defendants, ignored his grievances. *Id.* ¶ 24. Elliston contends that, on four separate occasions he asked the grievance coordinator about his grievances and appeals and was told "your being Block per- order of the warden (sic)." *Id.* ¶ 25. The grievance coordinator, however, is not named as a defendant and the alleged statement is inadmissible hearsay.

Elliston does not submit copies of the grievances and grievance appeals he filed. Nor does he specifically identify the issues asserted in the grievances. As the directive requires that each grievance may address only one issue, Dir. 9.6(5)(E)(2), Elliston's statement that he submitted grievances from January through March 2020 without any indication of the issues raised and in April 2020 about "COVID-10 issues and living conditions," Doc. No. 36-1 at 13, ¶¶ 23-24, does not show that he complied with the administrative remedy procedures by including only one issue in a grievance or that he raised the specific claim asserted here. Thus, the unsupported statements in Elliston's declaration are insufficient to establish that administrative remedies were not available to him. *See Heyliger v. Gebler*, No. 06-CV-6220-FPG, 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment, notwithstanding plaintiff's testimony that his "original grievance was discarded by prison officials," where plaintiff "never described or named the individual who allegedly took this

action"), *aff'd,* 624 F. App'x 780 (2d Cir. 2015); *see also Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming [plaintiff] did submit the grievances," plaintiff "offer[ed] no evidence that any particular officer thwarted his attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost"), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).

As Elliston has not submitted admissible evidence showing that administrative remedies were not available to him, Defendants' motion for summary judgment is granted on this ground. In light of this determination, the Court need not address Defendants' other arguments.

## IV.   CONCLUSION

Defendants' motion for summary judgment [**Doc. #29**] is **GRANTED** on the federal claim.

As no federal claims remain, the Court declines to exercise supplemental jurisdiction over Elliston's state law claim for intentional infliction of emotional distress. *See* 28 U.S.C. § 1367(c) (district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction....").

The Clerk is directed to enter judgment and close this case.

**SO ORDERED.**

Hartford, Connecticut
December 5, 2023

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge